10:57:23  1                    IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

EXELA PHARMA SCIENCES, LLC,  )
4                              )
                Plaintiff,     )
5                              ) C.A. No. 20-365(MN)
v.                             )
6                              )
ETON PHARMACEUTICALS, INC.,   )
7                              )
                Defendant.     )
8

9                          Thursday, July 29, 2021
                           11:00 a.m.
10                         Teleconference

11
                           844 King Street
12                         Wilmington, Delaware

13

BEFORE:   THE HONORABLE MARYELLEN NOREIKA
14            United States District Court Judge

15

16

APPEARANCES:
17

18                   FISH & RICHARDSON
                     BY:  ROBERT OAKES, ESQ.
19                   BY:  CORRIN N. DRAKULICH, ESQ.
                     BY:  CHRISTINA D. BROWN-MARSHALL, ESQ.
20
                            Counsel for the Plaintiff
21

22

                     DEVLIN LAW FIRM
23                   BY:  PETER MAZUR, ESQ.
                     BY:  NEIL A. BENCHELL, ESQ.
24
                            Counsel for the Defendant
25

1                         — — — — — — — — — —

2

10:57:42 3              THE COURT:  Good morning, counsel.  Who is

10:57:46 4    there, please?

11:02:47 5              MR. OAKES:  Good morning, Your Honor.  This is

11:02:51 6    Robert Oakes from Fish & Richardson on behalf of plaintiff,

11:02:52 7    Exela.  And also with me are my colleagues Corrin Drakulich

11:02:56 8    and Christina Brown-Marshall.  And Ms. Drakulich will be

11:03:00 9    handling the argument for plaintiff.

11:03:02 10             THE COURT:  All right.

11:03:03 11             MR. MAZUR:  Good morning, Your Honor.  Peter

11:03:06 12   Mazur, Devlin Law Firm, for Eton.  With me on the line this

11:03:09 13   morning is Neil Benchell who will be arguing for Eton.

11:03:14 14             THE COURT:  Good morning.  So I have the motion

11:03:19 15   to extend the schedule in front of me.  And I guess the

11:03:24 16   first question I have is for defendants, do you plan to be

11:03:32 17   in a position to come on the market in August of next year?

11:03:43 18             MR. BENCHELL:  Your Honor, Neil Benchell on

11:03:45 19   behalf of the defendants.  The answer to that question is

11:03:48 20   still up in the air.  As the CEO of the Eton Pharmaceutical

11:03:54 21   testified last week, two weeks ago, that whether to --

11:04:00 22   whether to launch at risk, the decision has yet to be made.

11:04:04 23   There has been no discussion with regard to that --

11:04:06 24             THE COURT:  Okay.  So if that's the case that

11:04:08 25   that is up in the air as in that is a possibility, then I

11:04:14 1    can't give you the extension that you're asking for.  So

11:04:18 2    what do we do?

11:04:22 3              MR. BENCHELL:  Your Honor, I'm not sure I

11:04:27 4    understand --

11:04:28 5              THE COURT:  Well, we are not having -- we are

11:04:32 6    not going to be in a position to move the trial because your

11:04:38 7    client is leaving open the possibility of coming on the

11:04:43 8    market on August 3rd.  So we cannot move the trial because I

11:04:47 9    cannot get a decision out by August 3rd if we move the

11:04:51 10   trial.  So we're not moving the trial because we need to

11:04:56 11   keep that August 3rd, 2022, date as a possible launch date.

11:05:02 12   So what is it that you think I should do?

11:05:05 13             MR. BENCHELL:  Well, Your Honor, at this point

11:05:08 14   what I can tell you is that the plaintiffs have taken the

11:05:18 15   agreed to deadline and simply ignored it.  They have

11:05:21 16   produced two-and-a-half times as many documents after the

11:05:25 17   document production.  They multiplied the production by

11:05:30 18   two-and-a-half times after the deadline for document

11:05:33 19   production than they did before.  And the prejudice to Eton

11:05:39 20   is self evident.  It does not provide a sufficient time,

11:05:44 21   doesn't provide anybody sufficient time to prepare for --

11:05:48 22             THE COURT:  Yes, but Mr. Benchell, you are not

11:05:50 23   listening to me.  Okay?  The only proposal I have in front

11:05:54 24   of you, in front of me is move the trial to some time after

11:06:02 25   May 13th.  You do understand that we cannot have a trial,

11:06:07 1     **post-trial briefing, and get a decision out to you by**

11:06:12 2     **August 3rd, which is what your client is telling me I may**

11:06:17 3     **need to do.  We cannot do it.  Okay?  Not going to happen.**

11:06:22 4     **So what is it that you really need that we can**

11:06:25 5     **do that will allow us to keep the trial date?  I understand**

11:06:29 6     **you think the plaintiff has been unreasonable, the plaintiff**

11:06:32 7     **thinks that your client bears part of the responsibility for**

11:06:36 8     **not being responsive in discovery, I think that there is**

11:06:40 9     **fault on both sides.  But I cannot do what you're asking me**

11:06:46 10     **to do.  So what is it that you think I can do, that we can**

11:06:49 11     **do to keep this trial date?**

11:06:51 12     **MR. BENCHELL:  Well, Your Honor, I think Eton**

11:06:55 13     **has certainly made it clear with regard to the trial date.**

11:06:59 14     **I think that in order to provide the equity and reduce the**

11:07:03 15     **prejudice that is self evident, I think that we need to**

11:07:08 16     **rearrange the schedule and perhaps that does mean that there**

11:07:12 17     **are going to be dates that are going to be compressed, but**

11:07:15 18     **the fact is is that we have now been hit with a substantial**

11:07:21 19     **document production well after the deadline, we really don't**

11:07:27 20     **have sufficient time to prepare for the end of discovery let**

11:07:30 21     **alone for expert discovery.**

11:07:32 22     **And so perhaps the answer to your question is**

11:07:35 23     **that we do need to change the schedule in some way, not the**

11:07:42 24     **trial schedule the Court has made clear, but to change the**

11:07:46 25     **schedule in some way to reduce the prejudice.**

11:07:51 1          You know, the question comes down is what's the

11:07:55 2   point of having deadlines if one party is simply going to

11:07:59 3   ignore them?  And so --

11:08:03 4          THE COURT:  I do understand that, and I will ask

11:08:07 5   the plaintiff to respond, though I think I know some of the

11:08:12 6   response that I'm going to get.  But the point is if your

11:08:15 7   client wants to be able to come on the market in August,

11:08:19 8   that's just -- I cannot help you, I cannot move the trial

11:08:22 9   date.  And I certainly cannot move the trial date to a date

11:08:26 10  in June.  I mean, you have to understand, do you agree with

11:08:31 11  me that that is a ridiculous request that you want to have a

11:08:35 12  trial sometime in June and you expect me to get a decision

11:08:39 13  out by the beginning of August?

11:08:43 14          MR. BENCHELL:  Your Honor, we certainly

11:08:45 15  understand your position with regard to that.  And as I said

11:08:50 16  --

11:08:50 17          THE COURT:  I mean, do you disagree?  You're

11:08:54 18  saying you can't even review documents; right?  Do you

11:08:58 19  disagree that what you are asking me is even more

11:09:01 20  unreasonable if you expect a trial in June?

11:09:04 21          MR. BENCHELL:  Of course not, Your Honor, we

11:09:06 22  don't disagree.

11:09:07 23          THE COURT:  All right.  So tell me what is --

11:09:11 24  the deadline for discovery is currently tomorrow.  What's

11:09:15 25  the update on the depositions?  Where are we?

11:09:18 1          MR. BENCHELL:  Well, we have -- well, plaintiffs

11:09:22 2    have taken the deposition of the CEO as well as the

11:09:29 3    30(b)(6).  They have taken depositions of two additional

11:09:31 4    witnesses this past couple of days.  They have -- we have a

11:09:39 5    date for next week to take another deposition of one of

11:09:45 6    Eton's witnesses.  We have taken depositions of Exela's

11:09:53 7    inventors, however, you know, that's without the benefit of

11:09:58 8    -- having the opportunity to review the documents in detail.

11:10:01 9    There is yet another third-party deposition that is supposed

11:10:06 10   to take place that has yet to be scheduled.

11:10:12 11          THE COURT:  Okay.  So I take it that there is

11:10:17 12   agreement by the parties that we're not going to finish the

11:10:20 13   depositions by tomorrow, even though that's the current

11:10:26 14   deadline in the schedule?

11:10:29 15          MR. BENCHELL:  Sure.  This is Neil Benchell

11:10:31 16   again on behalf of defendant.

11:10:33 17          As of right now, defendant's depositions have

11:10:39 18   been completed.

11:10:40 19          THE COURT:  Okay.  Let me hear from the

11:10:42 20   plaintiff.

11:10:42 21          MS. DRAKULICH:  Thank you, Your Honor.  This is

11:10:44 22   Corrin Drakulich.

11:10:46 23          With respect to plaintiff's depositions, we

11:10:48 24   could have been done, however, when we deposed Eton's CEO

11:10:55 25   who was designated for all the 30(b)(6) topics, counsel

11:11:00 1    agreed that he was not prepared enough.  So we designated

11:11:03 2    someone who is now to be deposed next week.  Short of that

11:11:07 3    deposition we would have been finished with the party

11:11:09 4    witnesses.  The one only exception is one third-party

11:11:12 5    company who has asked for their witness to be deposed

11:11:15 6    outside the discovery period.  And given that they are a

11:11:17 7    third party, our position is to grant that if Eton is

11:11:21 8    willing.

11:11:21 9              THE COURT:  Okay.

11:11:24 10              MR. BENCHELL:  Your Honor.

11:11:25 11              THE COURT:  Go ahead, Mr. Benchell.

11:11:27 12              MR. BENCHELL:  Thank you.

11:11:28 13         Just to make the record clear and I think we

11:11:30 14    made this clear on Mr. Brynjelsen's, the CEO's 30(b)(6)

11:11:36 15    transcript, we don't agree that Mr. Brynjelsen was not

11:11:40 16    properly prepared, but as an accommodation to Exela we're

11:11:45 17    willing to allow them to take the deposition that they had

11:11:48 18    already scheduled as the part of the 30(b)(6) deposition.

11:11:56 19              THE COURT:  Okay.  I appreciate the

11:11:59 20    accommodation so that it's not an issue that has to be

11:12:02 21    brought before me.

11:12:02 22         Okay.  So it sounds to me like things have

11:12:08 23    progressed pretty far in discovery, so it doesn't seem like

11:12:14 24    a three-month extension is required.  And I guess, let me

11:12:20 25    just ask the plaintiff, given that I said -- if I say you

11:12:25 1    cannot change the date for filing the pretrial order, the

11:12:29 2    pretrial conference, or the trial, do you think you can work

11:12:36 3    out a schedule with the defendants?

11:12:40 4              MS. DRAKULICH:  Absolutely, Your Honor.  I will

11:12:43 5    -- I think the schedule we proposed in our opposition brief

11:12:46 6    is workable.  We can also allow additional expert discovery

11:12:50 7    time if Eton really needs that.  What I will say, there is

11:12:54 8    plenty of room in the schedule for that.  Let me just pause

11:12:57 9    there.

11:12:57 10             What I will say, though, is with respect to

11:13:00 11   counsel's representation that they have not been able to

11:13:04 12   read the documents and couldn't prepare for the documents, I

11:13:06 13   think that is actually inconsistent with what we have been

11:13:08 14   seeing from the defendants in the depositions.  They have

11:13:11 15   had Exela's NDA since November of 2020.  And they have had

11:13:16 16   the vast majority of the custodial documents, the e-mails

11:13:20 17   and, you know, individual folders of the depos since May or

11:13:26 18   June 2nd depending on the witness, they have now deposed

11:13:29 19   those witnesses and they did not use, Eton's counsel did not

11:13:33 20   use a single document we produced in this case in those

11:13:37 21   depositions.  The only exhibits they used were the patents,

11:13:40 22   the filing, and I think a single press release.  So they

11:13:44 23   have had time to review the vast majority of documents

11:13:47 24   including the ones we identified in our rog responses.

11:13:50 25   Specifically in response to inquiries about what documents

11:13:53 1   are important to various issues, they have chosen to use

11:13:56 2   none, even the ones they have had substantial time to

11:14:00 3   review.  I think the prejudice here is a little overblown,

11:14:03 4   however, we're more than willing to grant whatever expert

11:14:06 5   discovery extensions Eton believes it needs to get through

11:14:09 6   the recently produced documents.

11:14:11 7              THE COURT:  Okay.

11:14:12 8              MS. DRAKULICH:  And I think between four and

11:14:16 9   six weeks is more than enough.

11:14:17 10              THE COURT:  So I am going to tell the parties

11:14:19 11   that you need to go back and agree to whatever modest

11:14:25 12   extension is required.

11:14:27 13              Two other things, though.  The Markman, I have

11:14:29 14   taken a look at the Markman issues, and it seems to me that

11:14:35 15   given that -- there are a few terms at issue, and the issue

11:14:39 16   on indefiniteness, it doesn't make sense for me to address

11:14:42 17   these issues now.  I might as well do them in the context of

11:14:46 18   trial.  I'm going to take the Markman hearing off the

11:14:49 19   calendar and we can address the Markman issues in connection

11:14:52 20   with the trial.

11:14:52 21              And the other thing that I will say is that the

11:14:52 22   Daubert motions, the proposal for the Daubert motions is not

11:15:02 23   workable.  It gives me like three weeks to deal with all

11:15:12 24   those Daubert motions, or maybe four weeks to deal with the

11:15:17 25   Daubert motions and given what is on my plate, that's not

11:15:21 1   useful to me.  So I need all of the Daubert motions

11:15:25 2   completed, fully briefed by December 30th.  So I'll let you

11:15:31 3   guys work out the particular schedule for doing that.

11:15:37 4            Okay.  So I'm going to ask you to go back and

11:15:41 5   talk.  You can take the Markman hearing out of it.  The

11:15:48 6   Daubert motions, as I said, need to be completed briefing by

11:15:53 7   December 30th.  And the dates that cannot change are the

11:15:56 8   filing of the pretrial order, the pretrial conference and

11:15:59 9   the trial.

11:16:01 10            So I think with that, the motion to extend the

11:16:08 11   schedule I guess is granted in part and denied in part as I

11:16:16 12   have just said.

11:16:17 13            Now, I want to talk about the motion to dismiss

11:16:22 14   the Counts 8 through 16, maybe, of the Second Amended

11:16:31 15   Complaint.  Let me hear from -- I guess it's the defendant's

11:16:38 16   motion, defendants first on that.

11:16:40 17            MR. BENCHELL:  Thank you, Your Honor.  Again,

11:16:42 18   Neil Benchell on behalf of defendants.

11:16:45 19            In ANDA litigation, the inquiry is a comparison

11:16:51 20   of the asserted claims against the product likely to be sold

11:16:56 21   following ANDA approval, but the evidence of that likely

11:16:59 22   product would be ANDA itself, including io batch data, divot

11:17:06 23   batches and the like.

11:17:08 24            In this case, the patent claims -- and again,

11:17:13 25   just to put this in context, these are the second three

11:17:16 1    patents that had been amended into the complaint rather than

11:17:21 2    all six of the patents.  So of those second set, the second

11:17:29 3    three patents, they all claim a requirement that the amount

11:17:33 4    of aluminum in the formulation be below 150 parts per

11:17:39 5    billion for either six or twelve months following

11:17:42 6    manufacture.

11:17:43 7              Eton produced their twelve-month stability

11:17:48 8    report long before this patent was actually issued, back in

11:17:51 9    September, and that stability report clearly shows that the

11:17:57 10   likely ANDA product is not going to meet the requirement of

11:18:02 11   maintaining 150 parts per billion between six and

11:18:06 12   twelve months following manufacture.

11:18:11 13             I might also add that recently Exela has also

11:18:17 14   been using a twenty-four-month study report that shows the

11:18:20 15   same thing.  So based on that, we don't believe that it

11:18:29 16   would have been appropriate given that Exela had the

11:18:35 17   knowledge that the ANDA itself, and the twelve-month

11:18:39 18   stability study report is part of the ANDA, that Exela knew

11:18:46 19   for some months prior to the patent issuing that the likely

11:18:42 20   product would not meet the requirements of these three

11:18:54 21   patents, and so we're moving to dismiss those patents

11:18:59 22   because the ANDA which is the document upon which Exela is

11:19:06 23   going to have to rely in order to prove infringement clearly

11:19:09 24   already states that they do not, that the products are

11:19:12 25   likely --

11:19:13 1            THE COURT:  But as I understood it, the ANDA if

11:19:19 2   approved would allow you to manufacture product that fit

11:19:28 3   within the claims, it's just your position is that the

11:19:33 4   batches on which there is data don't fall within those

11:19:36 5   claims.  Right?

11:19:38 6            MR. BENCHELL:  Well, if approved, the ANDA

11:19:45 7   product would allow not more than 350 parts per billion.

11:19:50 8            THE COURT:  Right.  So what I'm trying to

11:19:53 9   understand is, if approved, there is nothing that would

11:19:58 10  prevent Eton from selling products that meets the

11:20:04 11  limitations of the claims.

11:20:07 12           MR. BENCHELL:  Well, that's the problem.  The

11:20:13 13  issue with this type of infringement under 271(e) which is

11:20:16 14  that there is no product that is actually out there.  So

11:20:20 15  what the courts have relied upon is what the likely ANDA

11:20:23 16  product would be which is based on what the ANDA says.  And

11:20:27 17  what the ANDA says based on the twelve and twenty-four-month

11:20:32 18  stability study is that the likely ANDA product is not going

11:20:37 19  to meet that particular requirement of having a less than

11:20:42 20  150 parts per billion for either six or twelve months

11:20:46 21  following discovery -- following manufacture.

11:20:49 22           And so based on the ANDA, based on the likely

11:20:54 23  ANDA product, Eton's product is simply not going to infringe

11:21:00 24  those patents.

11:21:01 25           THE COURT:  All right.  Let me hear from the

11:21:02 1    plaintiff.

11:21:05 2              MS. DRAKULICH:   Your Honor, I believe the case

11:21:06 3    law is clear, as was the case in *Sunovion* and in *Par*, both

11:21:11 4    Federal Circuit cases, and as followed in the *Hospira* case

11:21:15 5    in the District of Delaware, when a defendant's ANDA seeks

11:21:19 6    FDA approval for products that meet the limitations of the

11:21:21 7    asserted claims, that is infringement as a matter of law.

11:21:24 8    That is the case here.   Eton's ANDA includes a specification

11:21:28 9    of aluminum for no more than 350 parts per billion.   That

11:21:34 10   necessarily is seeking approval for products that includes

11:21:36 11   things that are up to 150, which would infringe.   That is a

11:21:40 12   matter of infringement as a matter of law.   And in those

11:21:43 13   three cases, and there are others cited in the brief, they

11:21:47 14   actually distinguish the very line of cases Mr. Benchell is

11:21:51 15   talking about.   They distinguish *Ferring*, for example,

11:21:54 16   because that ANDA did not speak to the claim limitations.

11:21:57 17   So in that case, you look to what the product is likely

11:22:00 18   going to look like.

11:22:01 19              In this case, we're not living in that universe,

11:22:05 20   we're living in the universe where they are, in fact,

11:22:08 21   seeking FDA approval and would be allowed if they get the

11:22:12 22   approval to sell infringing products.   The only way around

11:22:16 23   this is for them to actually amend their specification to

11:22:19 24   include aluminum metals that do not fall within the claims.

11:22:23 25   And the case law has been very clear about that.

11:22:26 1            THE COURT:  All right.  Mr. Benchell, what do

11:22:29 2    you have to say about the *Sunovion* cases, I guess *Abbott*,

11:22:34 3    *Par*, can you respond?

11:22:39 4            MR. BENCHELL:  Yes, Your Honor.  In the *Sunovion*

11:22:42 5    case the court was presented with two types of evidence, one

11:22:46 6    from the ANDA and the second, a defendant declaration that

11:22:51 7    would not manufacture within the subject range.  The lower

11:22:55 8    court found in favor of the defendant in that case because

11:22:59 9    of the declaration, the independent and dependent

11:23:05 10   declaration.  The Federal Circuit overruled that because the

11:23:08 11   decision was based on something outside of the ANDA, not

11:23:12 12   part of the ANDA.

11:23:14 13           *Par* was even more definitive.  There it was

11:23:18 14   again another case where there was an internal document

11:23:22 15   suggesting that the product would -- the likely ANDA product

11:23:25 16   would be outside the range.  There the Federal Circuit said

11:23:28 17   even where internal documents suggest that a generic product

11:23:34 18   will not meet a claim limitation, the representations about

11:23:39 19   the ANDA scope control the infringement analysis.  In other

11:23:44 20   words, the ANDA itself controls the infringement analysis.

11:23:50 21           And that's also been in other cases as well, the

11:23:54 22   *Merck Sharp & Dohme* case in 2018 had the same conclusions

11:24:00 23   that you look at the ANDA.

11:24:02 24           THE COURT:  But Mr. Benchell, when you say look

11:24:05 25   at the ANDAs, what is it in the ANDA that would preclude

11:24:12 1    infringement of those claims?  Once approval is given, what

11:24:22 2    is it that would preclude infringement?

11:24:26 3              MR. BENCHELL:  So as part of the ANDA, Eton was

11:24:30 4    required to submit stability tests which show various

11:24:36 5    components of the products following manufacture,

11:24:42 6    twenty-four months following manufacture.  That's part of

11:24:44 7    the ANDA.  And the twelve-month and twenty-four-month

11:24:51 8    stability study clearly show that while at the time of

11:24:54 9    manufacture the amount of aluminum is within the 150 parts

11:25:00 10   per billion range, shortly thereafter, as little as three

11:25:04 11   months following manufacture, none of the batches, none of

11:25:06 12   the example batches, the batches that FDA relies on to

11:25:11 13   determine what the likely ANDA product is, none of those

11:25:18 14   batches say under 150 parts per billion following three

11:25:24 15   months after manufacturing.  So that's the document --

11:25:30 16             THE COURT:  I understand that, but that's not my

11:25:33 17   question.  Assume that you get approval, what is it -- I

11:25:39 18   mean, so then what is it -- if Eton starts manufacturing

11:25:47 19   batches that do meet it, then what, then Exela has to file

11:25:54 20   another infringement action?

11:25:56 21             MR. BENCHELL:  It's the same argument that's

11:25:59 22   been brought -- that's the same argument that's been brought

11:26:03 23   up in many of these cases.  The problem is that because

11:26:07 24   there is no product at market at this point, there is no way

11:26:11 25   of determining whether, you know, or controlling the way

11:26:19 1   that infringement would happen.  But that would be true

11:26:22 2   whether, in fact, the product was at market today or not.

11:26:25 3   We could have a product on market today that doesn't satisfy

11:26:29 4   the less than 150 parts per billion, but nothing that would

11:26:34 5   prohibit somebody after the case is over to lowering the

11:26:41 6   amount of aluminum in their product.  And so as a result,

11:26:46 7   the courts rely on the ANDA itself to say what that likely

11:26:53 8   product will be.

11:26:56 9              THE COURT:  All right.  Then --

11:27:04 10             MS. DRAKULICH:  Your Honor, I think what --

11:27:07 11             THE COURT:  I don't need to hear anymore.

11:27:08 12             So the motion to dismiss Counts VIII-XVI of the

11:27:12 13  Second Amended Complaint is denied.  Those counts assert

11:27:15 14  infringement of what the parties refer to as the "New

11:27:17 15  Patents" - the three that were added after this case began.

11:27:22 16             The issue is whether Plaintiff has plausibly

11:27:24 17  alleged infringement of the New Patents, which all cover

11:27:29 18  L-cysteine solutions, or methods of making L-cysteine

11:27:32 19  solutions, that contain less than about 150 parts per

11:27:36 20  billion aluminum for periods of six or twelve months.

11:27:39 21             In the Second Amended Complaint, for those

11:27:44 22  aluminum limitations, Exela relied on the overlap between

11:27:49 23  the claimed range and the specifications for the amount of

11:27:52 24  aluminum in Eton's Proposed ANDA Product.  Specifically,

11:27:56 25  Exela pled that "[t]he label for Eton's Proposed Generic

11:28:01 1    Cysteine Hydrochloride Product states that the product

11:28:02 2    contains no more than 350 micrograms per liter of aluminum.

11:28:07 3    By seeking approval for products containing no more than 350

11:28:13 4    micrograms per liter of aluminum, Eton is seeking approval

11:28:17 5    for products containing aluminum in the amounts recited in

11:28:20 6    Excel's patent claims identified above, through the

11:28:24 7    product's shelf-life."

11:28:26 8          Although, Eton says that its product do not meet

11:28:28 9    the claim limitations, I think that following Federal

11:28:32 10   Circuit precedent in *Sunovion Pharms, Inc. v. Teva Pharms.*

11:28:37 11   *USA, Inc.,* 731 F.3d 1271 (Fed. Cir. 2013) and *Abbott Labs.*

11:28:45 12   *v. TorPharm, Inc.*, 300 F.3d 1367 (Fed. Cir. 2002), the

11:28:48 13   pleadings here are sufficient to survive a motion to dismiss

11:28:52 14   as those cases suggest that what the ANDA filer has asked

11:28:56 15   the FDA to approve as a regulatory matter is what determines

11:29:00 16   whether infringement will occur.  And here, Eton may be

11:29:03 17   correct that the data in the ANDA is clear, but I cannot say

11:29:07 18   - certainly not at a motion to dismiss stage - that Exela

11:29:11 19   cannot show infringement of the claims of the New Patents

11:29:14 20   given that Eton is seeking approval of a product that could

11:29:18 21   infringe the claims.

11:29:20 22         So I'm denying the motion.

11:29:22 23         So I think that deals with the two motions I

11:29:25 24   have pending in this case.  Is there anything else that we

11:29:27 25   need to address while we are on the phone?

11:29:32 1                      Plaintiff?

11:29:32 2                      MS. DRAKULICH:  Nothing from plaintiffs, Your

11:29:35 3      Honor.   Thank you.

11:29:36 4                      THE COURT:  Defendant?

11:29:38 5                      MR. BENCHELL:  Nothing from defendant.   Thank

11:29:40 6      you very much, Your Honor.

11:29:41 7                      THE COURT:  Thank you everyone.   Have a good

11:29:43 8      weekend.

         9                      (Teleconference concluded at 11:29 a.m.)

        10

        11                      I hereby certify the foregoing is a true and
                accurate transcript from my stenographic notes in the proceeding.
        12

        13                                   /s/ Dale C. Hawkins
                                             Official Court Reporter
        14                                    U.S. District Court

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25